'08 CIV 6626

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



—————————————————————————x

MARIA DESOUSA, On Behalf of Herself And
All Others Similarly Situated,

                   Plaintiff,

    vs.

LEHMAN BROTHERS HOLDINGS INC.,
RICHARD S. FULD, JR., ERIN M. CALLAN,
WENDY M. UVINO, MICHAEL L. AINSLIE,
JOHN F. AKERS, ROGER S. BERLIND,
THOMAS H. CRUIKSHANK, MARSHA J.
EVANS, SIR CHRISTOPHER
GENT, JERRY A. GRUNDHOFER,
ROLAND A. HERNANDEZ, HENRY
KAUFMAN, JOHN D. MACOMBER, THE
EMPLOYEE BENEFIT PLAN COMMITTEE,
THE COMPENSATION AND BENEFITS
COMMITTEE, JOHN DOES 1-20,

                  Defendants.

:    Case No.

:    CLASS ACTION

—————————————————————————x

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974

     Plaintiff, a participant in the Lehman Brothers Holdings, Inc. 401(k) Savings Plan ("Plan") during the proposed Class Period, on behalf of the Plan, herself, and all others similarly situated, alleges as follows:

### I.     NATURE OF THE ACTION

    1.    Plaintiff brings this suit as a civil enforcement action under the Employee Retirement Income Security Act of 1974 ("ERISA") §§ 409, 502(a)(2), and (3), 29 U.S.C. §§ 1109 and 1132(a)(2), (3), for relief on behalf of the Plan. The Plan is a retirement plan operated and established by Lehman Brothers Holdings, Inc. ("Lehman Brothers" or the "Company") as a

benefit for its employees to permit tax-advantaged savings for retirement and other long-term goals. Lehman Brothers common stock is one of the investments offered in the Plan. According to the Company's Form 11-K filed with the U.S. Securities and Exchange Commission ("SEC") on December 31, 2006 (the "2006 11-K"), in excess of $230 million or more of the Plan's assets were invested in Lehman Brothers Stock. Indeed, the Plan was heavily invested in Lehman Brothers Stock at all times relevant to this action, as discussed herein.

2.      Plaintiff Maria DeSousa is a participant in the Plan. During the class period of September 13, 2006 through the present (the "Class Period"), her retirement portfolio included Lehman Brothers Stock.

3.      Plaintiff alleges that Defendants, as fiduciaries of the Plan, breached their duties to her and to other participants and beneficiaries of the Plan during the Class Period in violation of ERISA, particularly with regard to the Plan's holdings of Lehman Brothers Stock.

4.      Lehman Brothers is the sponsor of the Plan.

5.      Since the Plan's holdings in Lehman Brothers Stock comprised a significant percentage of the overall value of the assets held by the Plan, the long-term retirement savings of the Plan's participants were dependent to a substantial degree both on the performance of Lehman Brothers Stock, as well as the related need for prudent fiduciary decisions by Defendants concerning such a large, ongoing investment of assets of the Plan. This action alleges that the fiduciaries of the Plan breached their fiduciary duties to the Plan and its participants under ERISA, by, *inter alia*, selecting and maintaining Lehman Brothers Stock as an investment alternative for participant contributions and Company matching contributions, when it was no longer a suitable or prudent investment option for the Plan.

6.    The breaches were ongoing and arose out of Defendants' continuing duties to review, evaluate, and monitor the suitability of the Plan's investment in Lehman Brothers Stock, and to provide accurate material information to enable participants to make informed investment decisions concerning their holdings invested in Lehman Brothers Stock.

7.    The basic prudence allegations arise from the fact that Defendants knew, or should have known, that Lehman Brothers was engaging in risky and unsound business practices in connection with its investments in collateralized debt obligations, including its exposure to the subprime credit market, which have rendered Lehman Brothers Stock an imprudent, inappropriate and extraordinarily risky investment for the retirement savings of the Plan's participants.

8.    As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the Plan has suffered substantial damages, including the erosion of hundreds of millions of dollars of retirement savings and anticipated retirement income for the Plan's participants.    Indeed, the Plan's participants have seen their retirement savings accounts devastated as Lehman Brothers Stock plummeted from a high of approximately $70 per share near the beginning of the Class Period to approximately $18 per share as of the date of this complaint.  Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from these fiduciary breaches.

9.    Because Plaintiff's claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes participants such as Plaintiff to sue for Plan-wide relief for breach of fiduciary duty, Plaintiff brings this case as a class action on behalf of all participants and beneficiaries of the Plan during the Class Period.  Plaintiff also brings this action as a participant seeking Plan-wide relief for breach of fiduciary duty on behalf of the Plan.

10.     Because much of the information and documents on which Plaintiff's claims are based are solely in Defendants' possession, certain of Plaintiff's allegations are by necessity upon information and belief.   At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff may, to the extent necessary and appropriate, further amend the Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the claims below.

## II.     JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.     This Court has personal jurisdiction over Defendants under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), as one or more of the Defendants may be found in this District.   The Court also has personal jurisdiction over Defendants because the Company maintains executive offices in this District, and the Plan is administered within this District.   Defendants systematically and continuously have done and continue to do business in this District, and this case arises out of Defendants' acts within this District.

13.     Venue is proper under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendants administer the Plan in this District, some or all of the actionable conduct for which relief is sought occurred in this District, and/or one or more of the Defendants reside or may be found in this District.

## III.     THE PARTIES

**Plaintiff**

14.     Plaintiff Maria DeSousa is a resident of the State of New Jersey.   She is a participant in the Plan within the meaning of ERISA § 3(7) and 502(a), 29 U.S.C. § 1102(7) and

§1132(a).  During the Class Period, Plaintiff DeSousa held Lehman Brothers Stock in her individual Plan account.

**Corporate Defendants**

15.    Defendant Lehman Brothers Holdings, Inc. is a Delaware corporation with its principal place of business located at 745 Seventh Avenue, New York, NY 10019. Through its Capital Markets, Investment Banking and Investment Management business segments, Lehman Brothers provides financial services to corporations, governments and individuals worldwide. *See* the Company's Form 10-K filed with the SEC on January 29, 2008 (the "2007 10-K"), at 3.

16.    Upon information and belief, Lehman Brothers at all times acted through its officers, directors and employees, including the Chief Executive Officer ("CEO").  Lehman Brothers had, at all times relevant herein, effective control over the activities of its officers and employees, including their Plan-related activities.    Lehman Brothers exercises ultimate discretionary decisional authority with respect to all aspects of the administration of the Plan, management and disposition of the Plan's assets, and appointment and removal of fiduciaries through its management employees, Lehman Brothers' Board of Directors (the "Board"), Compensation and Benefits Committee and/or Employee Benefit Plan Committee (terms defined herein).

17.    Upon information and belief, under the terms of the Plan, Lehman Brothers was given direct control and management over any aspect of the operation, or administration of the Plan that was not specifically delegated to the named fiduciaries under the Plan and upon information and belief, exercised this control.  Upon information and belief, the Plan names Lehman Brothers as the administrator, as that term is defined in Section 3(16) of ERISA 29 U.S.C. § 1002(16).  Under ERISA, a plan administrator is inherently a fiduciary.

18.     As a matter of corporate law, Lehman Brothers is imputed with the knowledge that its Board and management employees had of the misconduct alleged herein, even if not communicated to Lehman Brothers.

19.     Upon information and belief, Lehman Brothers, together with its Board, exercised responsibility for communicating with participants regarding the Plan, and providing participants with information and materials required by ERISA.  In this regard Lehman Brothers, together with the Board, drafted and disseminated various documents and materials related to the Plan, including but not limited to, a Summary Plan Description ("SPD") and the documents incorporated into the SPD.  Based on the allegations contained herein, Lehman Brothers is a fiduciary with respect to the Plan because it exercised discretionary authority or discretionary responsibility in the administration of the Plan, exercised discretionary authority or control with respect to the management of the Plan's assets, and exercised discretionary authority and control with respect to the appointment of other Plan fiduciaries.

20.     *The Board*.   Upon information and belief, the business and affairs of the Company are managed under the direction of the Board, including with respect to the Company's role as a fiduciary of the Plan.  One of the many roles or functions of the Board is the power to appoint the members of the Compensation and Benefits Committee and Employee Benefit Plan Committee (as defined below).  Upon information and belief, the Board likewise exercised management or control over the Compensation and Benefits Committee and Employee Benefit Plan Committee.  Based on the above, the Board is a fiduciary with respect to the Plan because it exercised discretionary authority or discretionary responsibility in the administration of the Plan, exercised discretionary authority or control with respect to the management of the

Plan's assets, and exercised discretionary authority and control with respect to the appointment of other Plan's fiduciaries.

21.    *The Compensation and Benefits Committee.*  One purpose of the Compensation and Benefit Committee (the "Compensation Committee") is to "[d]ischarge the responsibilities of the Board of Directors with respect to the Corporations' compensation and benefits programs." See Compensation Committee Charter. The Compensation committee consists of Mr. John Akers, the chair of the Compensation Committee, Ms. Marsha Evans, Sir Christopher Gent, and Mr. John Macomber, each of whom sits on the Board of Directors. Upon information and belief, the Compensation Committee had overall responsibility for the Plan.

22.    *The Employee Benefit Plan Committee.*  The Plan assigned fiduciary responsibilities to an Employee Benefit Committee (the "Benefit Plan Committee"). Upon information and belief, the Benefit Plan Committee is a "Named Fiduciary" under the Plan and under § 402(a) of ERISA, 29 U.S.C. § 1102(a). The Benefit Plan Committee consists of the persons that administer the Plan, and has overall responsibility for its management and operation. According to the 2007 Form 11-K, the Benefit Plan Committee is the Plan Administrator. Upon information and belief, members of the Benefit Plan Committee are appointed by the Compensation Committee.

**Individual Defendants**

23.    Defendant Richard S. Fuld, Jr. ("Fuld") served as Lehman Brothers' Chief Executive Officer and Chairman of the Board during the Class Period. Fuld was a fiduciary in that, in his high-level capacity and role within the Company, he exercised discretionary authority with respect to administration, control and/or management of the Plan.

24.    Defendant Erin M. Callan ("Callan") served as the Chief Financial Officer, Controller and Executive Vice President of the Company during the Class Period.

25.    Defendant Wendy M. Uvino ("Uvino") served as the Chairperson of the Benefit Plan Committee during the Class Period. Uvino signed the Form 11-K filed with the SEC for the year ended December 31, 2006 for the Plan and the Forms 5500 for the Plan filed with the Department of the Treasury and Internal Revenue Service for the 2006 tax year.

26.    Defendant Michael L. Ainslie ("Ainslie") served as member of the Board during the Class Period. During the Class Period, Ainslie served on the Board's Audit Committee.

27.    Defendant John F. Akers ("Akers") served as member of the Board during the Class Period. During the Class Period, Akers served as the Chairman of the Compensation Committee, and as a member of the Board's Finance and Risk Committee.

28.    Defendant Roger S. Berlind ("Berlind") served as member of the Board during the Class Period. During the Class Period, Berlind served on the Audit Committee and the Finance and Risk Committee.

29.    Defendant Thomas H. Cruickshank ("Cruickshank") served as member of the Board during the Class Period. During the Class Period, Cruickshank served as a Chairman of the Board's Audit Committee and as a member of the Nominating and Corporate Governance Committee.

30.    Defendant Marsha J. Evans ("Evans") served as a member of the Board during the Class Period. During the Class Period, Evans served as a member of the Compensation Committee and the Finance and Risk Committee.

31.    Defendant Sir Christopher Gent ("Gent") served as a member of the Board during the Class Period. During the Class Period, Gent served on the Audit Committee and the Compensation Committee.

32.    Defendant Jerry A. Grundhofer ("Grundhofer") served as a member of the Board during the Class Period.

33.    Defendant Roland A. Hernandez ("Hernandez") served as a member of the Board during the Class Period. During the Class Period, Hernandez served as a member of Finance and Risk Committee.

34.    Defendant Henry Kaufman ("Kaufman") served as a member of the Board during the Class Period. During the Class Period, Kaufman served as the Chairman of the Finance and Risk Committee.

35.    Defendant John D. Macomber ("Macomber") served as a member of the Board during the Class Period. During the Class Period, Macomber served as a member of the Compensation Committee, the Executive Committee, and the Nominating and Corporate Governance Committee.

36.    The defendants identified in ¶¶ 23 through 35 are sometimes referred to herein as the "Individual Defendants." The Individual Defendants are fiduciaries of the Plan within the meaning of ERISA.

37.    *The Board Defendants.* Lehman Brothers, as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, Lehman Brothers relied and continues to rely directly on each of the Board Defendants to carry out its fiduciary responsibilities under the Plan and ERISA as specified in ¶ 20 of this Complaint and therefore each member of the Board is a fiduciary for the reasons stated in ¶ 20.

38.    In addition, each member of the Board carried out the Board's role as a fiduciary with respect to the Plan as set forth in ¶ 20, engaged in the conduct and had the powers and duties alleged in ¶ 20, and was, therefore, a fiduciary for the reasons set forth in ¶ 20.

39.    The individuals who served on the Board and acted as fiduciaries with respect to the Plan during the Class Period are as follows:  Defendants Fuld, Callahan Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Grundhofer, Hernandez, Kaufman, and Macomber (collectively, the "Board Defendants").

40.    ***The Compensation Committee Defendants***.  During the Class Period, each member of the Investment Committee carried out the Investment Committee's role as a fiduciary with respect to the Plan as set forth in ¶ 21, engaged in the conduct and had the powers and duties alleged in ¶ 21 and was therefore a fiduciary for the reasons set forth in ¶ 21.

41.    The individuals who served on the Compensation Committee and acted as fiduciaries with respect to the Plan during the Class Period are as follows:  Defendant Akers, Evans, Gent and Macomber (collectively, the "Compensation Committee Defendants").

42.    Plaintiff does not currently know the identity of all the Compensation Committee Defendants during the Class Period.  Therefore, the members of the Compensation Committee Defendants are named fictitiously, as Defendants Does 1 to 10.  Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

43.    ***The Benefit Plan Committee Defendants***.  During the Class Period, each member of the Benefit Plan Committee carried out the Benefit Plan Committee's role as a fiduciary with respect to the Plan as set forth in ¶ 22, engaged in the conduct and had the power and duties alleged in ¶ 22, and was therefore a fiduciary for the reasons set forth in ¶ 22.

44.    Defendant Uvino served on the Benefit Plan Committee and acted as a fiduciary with respect to the Plan during the Class Period.

45.    Plaintiff does not currently know the identity of all the members of the Benefit Plan Committee during the Class Period.  Therefore, the members of the Benefit Plan Committee

Defendants are named fictitiously, as Defendants Does 11 to 20. Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

46.    The Compensation Committee Defendants and the Benefit Plan Committee Defendants are collectively referred to herein as the "Committee Defendants." The Compensation Committee and the Benefit Plan Committee are collectively referred to herein as the "Committee."

## IV.    NATURE OF THE PLAN

47.    The Plan is a defined contribution 401(k) plan that became effective on January 1, 1984, and covers eligible employees of Lehman Brothers and its subsidiaries. The purpose of the Plan is to encourage employees to save for retirement. An eligible employee who is employed by the Company may elect to make salary deferral 401(k) plan contributions upon commencement of his or her employment.

48.    Each participant in the Plan may elect to make contributions to the Plan on a pre-tax basis through payroll deductions between 1% and 50% of such participant's eligible compensation (as defined in the Plan document) for each pay period up to an annual maximum of $15,000 for 2006. In addition, participants who are age 50 or older and have made the maximum contribution to the Plan, can make an additional catch-up contribution to the Plan through payroll deductions between 1% and 25% of eligible compensation to an annual maximum of $5,000. A participant can elect to change the rate at which his/her contribution is determined at any time during the year.

49.    In 2006, the Company provided a discretionary matching contribution in either Lehman Brothers Stock or cash to those eligible participants who have a twelve month period of service. The discretionary contribution is allocated as follows: (1) Participants with annual compensation below $50,000, and who are not in any position designated to be excluded from

the Company contribution, will receive a Company contribution of $500 plus 100% of the first

$3500 of their pre-tax contributions; (2) Participants with annual compensation between $50,000

and $200,000 will receive a Company contribution of up to 100% of the first $4000 of their pre-

tax contributions, only if there are funds remaining after contributions are made for the

participants making less than $50,000 per year; (3) Company contributions are not made for

participants with annual compensation in excess of $200,000.

50.    For the 2007 Plan year, Company contributions were made in cash and were

invested in accordance with the participant's elections for the employee contribution. However

for the 2006 Plan year, Company contributions were made in cash, which was then immediately

invested in the Lehman Brothers Common Stock Fund. *See* 2007 Form 11-K.

51.    Individual notional accounts are maintained for each Plan participant. Each

participant's notional account is credited with employee contributions, Company matching

contributions and investment earnings, and charged with the allocation of investment losses.

52.    According to the 2006 11-K, "[p]articipants are immediately 100% vested in their

pre-tax and catch-up contributions for all Plan years and in any Company contributions that were

made for any Plan year prior to 2005. Participants shall be 100% vested in their Company

contributions made for 2005 and later Plan years once they have attained three years of vesting

service, as defined by the Plan document."

53.    The Plan is an "employee pension benefit plan" within the meaning of ERISA

§ 3(2)(A), 29 U.S.C. § 1002(2)(A). Further, it is an "eligible individual account plan" within the

meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and also a "qualified cash or deferred

arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k). While the Plan is not a

party to this action, pursuant to ERISA, the relief requested in this action is for the benefit of the Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

54.    An employee benefit plan, such as the Plan, must be "established and maintained pursuant to a written instrument." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). ERISA requires that every participant in an employee benefit plan be given a SPD.

55.    The assets of an employee benefit 401(k) plan must be held "in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class Period, the assets of the Plan were held in trust by Fidelity Management Trust Company and its affiliates.

56.    ERISA and the Internal Revenue Code require that plans file an Annual Report, Form 5500, with the Department of Labor and the Department of the Treasury. The Plan filed a Form 5500 in October 2006 that was signed by Defendant Uvino.

57.    As of December 31, 2007, the Plan held Lehman Brothers Stock with a fair market value of approximately $228 million. As of December 31, 2006, the Plan held shares of Lehman Brothers Stock with a fair market value of $233 million.

### V.    CLASS ACTION ALLEGATIONS

58.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and a class consisting of all participants (and beneficiaries thereof) of the Plan, whose individual accounts included investments in Lehman Brothers Stock during the Class Period of September 13, 2006 through the present. Excluded from the Class are Defendants, members of the Defendants' immediate families, any officer, director, or partner of any Defendant, any entity in which a Defendant has a controlling interest, and the heirs, successors, or assigns of any of the foregoing.

59.    This action is properly maintainable as a class action because:

- 13 -

60.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown by Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are, at a minimum, thousands of members of the Class.

61.    Plaintiff's claims are typical of those of the Class because Plaintiff, members of the Class and the Plan suffered similar harm and damages as a result of Defendants' systematic unlawful conduct described herein. Absent a class action, the Plan and/or members of the Class may not receive restitution or other appropriate relief, will continue to suffer losses, and these violations of law will proceed without remedy.

62.    Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class and have retained counsel competent and experienced in class action litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class they seek to represent.

63.    A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein. Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class, which would then establish incompatible standards of conduct for Defendants. As the damages suffered by the individual Class members, direct or indirect through their participation in the Plan may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to redress the wrongs done to them and/or the Plan. The likelihood of individual Class members prosecuting separate claims is remote. Furthermore, Defendants' conduct affected and affects all Class members in a similar manner, making declaratory and injunctive relief to the Class as a whole appropriate.

64.    The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class. The questions of law and fact that are common to Plaintiff and the Class include, among others:

- Whether ERISA applies to the claims at issue;

- Whether Defendants owe and owed fiduciary duties to the members of the Class;

- The nature of the fiduciary duties Defendants owe or owed to members of the Class;

- Whether Defendants breached their fiduciary duties; and

- The extent of losses sustained by the Plan, and thereby members of the Class, and the appropriate measure of relief.

65.    Plaintiff anticipates no unusual difficulties in the management of this action as a class action.

## VI.    DEFENDANTS' FIDUCIARY STATUS

66.    During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plan and/or management or disposition of the Plan's assets.

67.    During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

68.    **Named Fiduciaries.** ERISA requires every plan to provide for one or more named fiduciaries of the Plan pursuant to ERISA § 402(a)(1)-(2), 29 U.S.C. § 1102(a)(1) and (2). Upon information and belief, the Committee Defendants are Named Fiduciaries under the Plan. In addition, the Lehman Brothers Defendants are Named Fiduciaries since they were appointed the Plan's Administrator.

69.    **De Facto Fiduciaries.** ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries,

- 15 -

i.e., perform fiduciary functions (including a juridical person such as Lehman Brothers). ERISA § 3(2 E)(A)(i), 29 U.S.C. § 1002(21)(A)(i), makes a person a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or . . . has any discretionary authority or discretionary responsibility in the administration of such plan." During the Class Period, all of the Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA, by, among other things, the conduct alleged in herein.

## VII.    DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

70.    ERISA is a comprehensive statute covering virtually all aspects of an employee benefit plan, including retirement savings plans, such as the Plan. The goal of ERISA is to protect the interests of the Plan's participants and their beneficiaries:

> It is hereby declared to be the policy of this chapter to protect interstate commerce and the interests of participants in employee benefit Plan and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit Plan, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

ERISA § 2(b), 29 U.S.C. § 1001(b).

71.    Under ERISA, those responsible for employee benefit plan management stand in a fiduciary relationship to plan participants. Pursuant to ERISA, a "fiduciary" is defined broadly to include all persons or entities that are able to exercise discretionary authority over the management of a plan or the payment of benefits. 29 U.S.C. § 1002(21)(A). ERISA requires strict fidelity and loyalty in the execution of the plan's management.

72.    ERISA imposes on Defendants, who are responsible for the Plan, the requirement to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man [or woman] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

73.    ERISA also imposes on Defendants responsible for the Plan a duty of loyalty, requiring these Defendants to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . for the exclusive purpose of . . . providing benefits to the participants and their beneficiaries." ERISA § 404 (a)(1)(A)(i), 29 U.S.C. § 1104(a)(l)(A)(i).

74.    Other duties imposed upon Defendants who are fiduciaries under ERISA by virtue of their exercise of authority or control respecting the management of the Plan or disposition of Plan's assets, include but are not limited to:

(a)    The duty to investigate and evaluate the merits of decisions affecting the use and disposition of Plan's assets;

(b)    The duty to evaluate all investment decisions with "an eye single" to the interests of Plan's participants and beneficiaries;

(c)    The duty to avoid placing themselves in a position where their acts as officers, directors, or employees of the Company will prevent their functioning with the complete loyalty to    participants demanded of them as plan fiduciaries and, if they find themselves in such a position, to seek independent, unconflicted advice;

(d)    To the extent that a party is responsible for appointing and  removing fiduciaries, the duty to monitor those persons who have been named, which includes, among other things: 1) the duty to ensure that the appointed fiduciary possesses the needed credentials to fulfill his or her duties; 2) the duty to make sure that the appointed fiduciary has adequate knowledge to fulfill his or her duties; 3) the duty to insure that the appointed fiduciary has access to and retains impartial advisers when needed; 4) the duty to require that the appointed fiduciary report regularly to the monitoring fiduciary; and 5) the duty to remove a fiduciary if that fiduciary has breached his or her fiduciary duty or is not performing his or her fiduciary functions in accordance with ERISA;

(e)    The duty to disclose and inform the Plan's Participants of any material adverse information about the Plan that duty entails, among other things: (1) a duty not to make materially false statements or misinform the Plan's participants concerning any aspect of the Plan including its investments; (2) an affirmative duty to inform the Plan's participants about material adverse factors that were affecting the Plan or its investments at any time the fiduciary knew or should have known, pursuant to his duty to investigate, that failing to make such a disclosure might be harmful; and (3) when a plan is composed of various investment funds, the duty to inform and disclose also includes the duty to impart to plan participants material information that the fiduciary knows or should know is sufficient to appraise the average plan participant of the comparative risks associated with investing in any particular investment;

(f)    A duty to insure that investments were not purchased at a price above what the Defendants, but not the participants and beneficiaries, knew or should have known to be in excess of fair market value as defined in the relevant Treasury regulations

and in most instances at a price that renders it improbable that the investments will bring

a fair return commensurate with the prevailing rates;

(g)    A duty to diversify the Plan's investments to minimize the risk of large

losses to the Plan and its participants; and

(h)    The duty to not blindly follow plan documents if doing so leads to an

imprudent result. A fiduciary may not avoid fiduciary responsibility by relying solely on

the language of plan documents.

75.    ERISA permits the fiduciary function to be shared among various individuals and

entities. Given ERISA's functional concept of a fiduciary, absent formal discovery it is

impossible to know the full extent of which fiduciaries exercised which fiduciary functions.

76.    Insofar as the Plan was not properly diversified funds and therefore more risky to

the Plan's participants, the Defendants had heightened fiduciary duties to the Plan's participants

with respect to the Plan's investment in Lehman Brothers Stock, including heightened duties to

disclose all material information relevant to investments in Lehman Brothers Stock.

77.    A fiduciary is liable not only for the fiduciary's own breach, but is also liable as a

co-fiduciary if:

(a)    the fiduciary participates knowingly in, or knowingly undertakes to

conceal, an act or omission of another fiduciary, knowing such act or omission is a

breach; or

(b)    if, by the fiduciary's failure to comply with ERISA § 404(a)(1), 29 U.S.C.

§ 1104 (a)(1) in the administration of his specific responsibilities that gives rise to

fiduciary status, the fiduciary enables another fiduciary to commit a breach; or

(c)    the fiduciary knew or should have known of a breach by such other

fiduciary and does not make reasonable efforts under the circumstances to remedy the

breach.

## VIII.    LEHMAN BROTHERS STOCK WAS AN IMPRUDENT INVESTMENT FOR THE PLAN

### A.    Background of the Subprime Industry

78.    Subprime lending is the practice of making mortgage loans to persons who are

generally unable to access credit from traditional financial institutions. This is because they do

not satisfy credit, documentations or other underwriting standards mandated by these traditional

mortgage lenders and loan buyers, which typically lend only to more credit-worthy borrowers.

79.    Because subprime borrowers are seen as "higher risk," their loans carry interest

rates that are at least two percentage points higher than those offered to borrowers with better

credit. So, for example, while a credit-worthy borrower could get a mortgage at 5% interest, the

same mortgage would cost a subprime customer 7% interest or more.

80.    The subprime market has grown rapidly in recent years. In 1994, fewer than

5% of mortgage originations in the United States were subprime, but by 2005 about 20% of

mortgage originations were subprime. The greater access to subprime mortgages has helped

homeownership grow.

81.    Subprime mortgages totaled $600 billion in 2007, accounting for about one-fifth

of the U.S. home loan market. An estimate of $1.3 trillion in subprime mortgages are currently

outstanding.

82.    The rapid growth of the subprime lending industry has been attributed to a

number of factors that occurred in 2004 and 2005. These factors include rising home prices,

declining affordability, historically low interest rates, intense lender competition, innovations in

the structure and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors.

83.    The mortgage market was further fueled by significant mortgage-backed securities liquidity, with investors increasingly seeking yield through higher risk securitizations that allow financial institutions to access the capital markets to fund mortgage operations, while simultaneously transferring credit risk away from the institutions and to securitization investors. The share of U.S. mortgage debt held outside the government-sponsored enterprises by private mortgage-backed securitizations doubled between 2003 and 2005, helping to fuel the growth of subprime and nontraditional mortgages.

84.    From 2001 to mid-2004, prime borrowers with a preference for fixed-rate mortgages refinanced in record numbers as long-term interest rates fell to the lowest rates in a generation.  As interest rates began to rise in 2004 and the pool of potential prime borrowers looking to refinance shrank, lenders struggled to maintain or grow market share in a declining origination environment, and did so by extending loans to subprime borrowers with troubled credit histories.

85.    Lenders accommodated these borrowers by diversifying mortgage offerings as they competed to attract borrowers and meet prospective homebuyers' financing needs.  Because of the affordability aspect already noted, borrowers increasingly turned to products such as payment option and interest-only (IO) loan structures in 2004 and 2005.  These "nontraditional" mortgages are specifically designed to minimize initial mortgage payments by eliminating or relaxing the requirement to repay principal during the early years of the loan.  Payment option and interest-only loans appear to have made up as much as 40 to 50% of all subprime and Alt-A loans securitized by private issuers of mortgage-backed securities during 2004 and 2005, up from

10% in 2003. The majority of subprime originations over the past several years were "2/28 and 3/27" hybrid loan structures. These hybrid loans provide an initial fixed-rate period of two or three years, after which the loan converts to an adjustable-rate mortgage and the interest rate adjusts to the designated loan index rate for the remaining 28 or 27 years of the loan. The 2/28 and 3/27 loan products accounted for almost three-quarters of subprime securitized mortgages in 2004 and 2005.

86.    Subprime lenders also eased lending standards to take advantage of these borrowers, including limited or no verification of borrower income and high loan-to-value transactions.

87.    In late 2004 and early 2005, there was a growing sense of concern regarding the subprime industry, and in particular the eased lending standards. To address those concerns, the Federal Reserve and other banking agencies issued guidance on subprime lending. The Interagency Guidance on Nontraditional Mortgage Product Risks highlights sound underwriting procedures, portfolio risk management, and consumer protection practices that institutions should follow to prudently originate and manage nontraditional mortgage loans. A major aspect of this guidance is the recommendation that a lender's analysis of repayment capacity should include an evaluation of the borrower's ability to repay debt by final maturity at the fully indexed rate, assuming a fully amortizing repayment schedule. The guidance also reminds institutions that they should clearly communicate the risks and features of these products to consumers in a timely manner, before consumers have applied for a loan.

88.    In 2006, mortgage interest rates hit four-year highs, the volume of home sales declined and the rate of home price appreciation decelerated and in some cases home prices fell, leaving the most recent subprime borrowers vulnerable to payment difficulties. Subprime

borrowers with ARMs experienced a large increase in delinquency and foreclosure rates, while prime borrowers experienced almost no increase in delinquencies and foreclosures. Borrowers were not able to avoid sharp payment increases as they could in earlier years. Even borrowers with enough equity to refinance their adjustable rate mortgages faced difficulty finding a loan with affordable payments, as interest rates edged higher than in earlier years.

89.    Moreover, an unusually large number of subprime loans defaulted shortly after origination. In many of these "early payment defaults," borrowers stopped making payments before they faced payment shocks, suggesting that in 2006 some lenders may have lowered their underwriting standards in the face of reduced borrower demand for credit.

90.    Instead of holding mortgage loans generally, lenders sold subprime mortgages that were bundled into pools of securities and offered them to individual and institutional investors.

91.    These pools of securities are called collateralized debt obligations ("CDOs"). A CDO is an investment-grade security backed by a pool of bonds, loans and other assets, such as mortgages

92.    In 2006, approximately 80,000 subprime borrowers who took out mortgages that were packaged into securities fell into delinquency and during the first half of 2007, dozens of lenders participating in the subprime mortgage business ceased operating as defaults and delinquencies on recent loans skyrocketed.

93.    At all times relevant to this action, Lehman Brothers heavily underwrote risky pools of securities tied to subprime mortgages, using complex vehicles such as CDOs.

94.    Having invested hundreds of millions of dollars in securities backed by subprime mortgages which had become nearly worthless, Lehman Brothers was ultimately forced to announce substantial mortgage-related charges.

95.    Plaintiff allege that Defendants knew or should have known that the Plan's heavy investment in Lehman Brothers Stock was imprudent since Lehman Brothers was encountering enormous and very serious problems as a result of its significant investments in CDOs and other similar vehicles, as well as internal control and risk management failures. As a consequence of those company-specific problems, which were not adequately or completely disclosed to the market or the participants in the Plan, investment in Lehman Brothers Stock was exceedingly risky and the Company's stock was artificially inflated.

**B.    Lehman Brothers' Involvement in the Subprime Industry**

96.    Over the past decade, Lehman Brothers became a major player in the mortgage market and in underwriting securities backed by subprime mortgages. The Company was heavily invested in CDOs and purchased several mortgage originators to fuel its securitization of mortgage-backed CDOs. In 2004, Lehman Brothers purchased BNC Mortgage LLC, which was lending more than $1 billion per month as of the first quarter of 2006. Yalman Onaran, *Lehman Brothers Fault-Finding Points to the Last Man Fuld as Shares Languish, Bloomberg News*, July 22, 2008 ("Lehman Fault Finding"). By 2006, Lehman Brothers was the top underwriter for subprime mortgage-backed securities, with a roughly 11 percent market share. Jenny Anderson and Vikas Bajaj, *Lehman Brothers Closes Subprime Unit and Lays Off 1,200*, New York Times, Aug. 23, 2007. Lehman Brothers also bought mortgage lender Aurora Loan Services, LLC, which provides "Alt-A Loans" (loans that are not considered subprime, but are made without full documentation of assets). Aurora originated more than $3 billion per month in loans in the first half of 2007. Yalman Onaran, Lehman Fault-Finding, *Bloomberg News,* July 22, 2008.

97.    Lehman Brothers' appetite for accumulating subprime debt continued throughout the market collapse of 2007 and 2008, during which it continued to aggressively underwrite mortgage-backed securities, accumulating an $85 billion portfolio. *Id.*

98.    Despite the fact that Defendants knew, or should have known, about the Company's deteriorating mortgage portfolio and serious financial problems, Defendants failed to disclose materially adverse facts to the market and Plan participants throughout the Class Period. The Complaint alleges that throughout the Class Period, Defendants negligently failed to disclose the following materially adverse facts which seriously impacted the overall health of the Company: (1) the full extent of the Company's exposure to losses incurred from trading in subprime mortgage backed derivatives; (2) the extent of the Company's exposure to losses incurred from mortgage-backed securities, including its failure to timely write-down its positions in these securities; (3) the nature and extent of its exposure to losses incurred from mortgage-backed security originations, including its failure to timely write-down its positions in these securities; (4) that the Company had materially overvalued its positions in commercial and subprime mortgages, and in securities tied to these mortgages; (5) that the Company had inadequate reserves for its mortgage and credit related exposure; (6) that the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and (7) that the Company lacked adequate internal and financial controls.

**C.    Defendants Touted Lehman Brothers Financial Health to the Plan Participants**

       *1.    Fall 2006 – Warning Signs of Trouble in The Subprime Market And Lehman Brothers Fails to Adequately Take Actions to Protect Plan Participants.*

99.    Despite that Defendants knew or should have known about Lehman Brothers' risky business practices and artificially inflated stock during the Class Period, the Company fostered a positive attitude toward Lehman Brothers Stock as a Plan investment. Management

touted strong Company performance and stock benefits. Employees were continually told positive news by Company executives about Lehman Brothers' growth, and were led to believe that Lehman Brothers Stock was a good investment.

100.    Moreover, Lehman Brothers publicly and repeatedly highlighted favorable operating results, favorable revenue growth trends, and other positive financial indicators, which were later found to be misleading.

101.    For example, on September 13, 2006, the beginning of the Class Period, Defendants issued a press release "Lehman Reports Third Quarter Results; Reports Net Income of $916 Million and Net Reserves of $4.2 Billion." The release stated:

> Lehman Holdings Inc. (ticker symbol: LEH) today reported net income of $916 million for the third quarter ended August 31, 2006, or $1.57 per common share (diluted), representing increases of 4% and 7% respectively, from net income of $879 million, or $1.47 per common share (diluted), reported for the third quarter of fiscal 2005. Second quarter fiscal 2006 net income was $1.0 billion, or $1.69 per common share (diluted).

Lehman Brothers' continued its rosy outlook telling the market, and in turn Plan participants:

> *Fixed Income Capital Markets net revenues increased 6% to $2.0 billion in the third quarter of fiscal 2006 from $1.9 billion in the third quarter of 2005, reflecting record results in real estate and strong results in foreign exchange products, partially offset by lower performances within mortgages, high yield and interest rate products. Id.* [Emphasis added].

102.    Yet, while Lehman Brothers was discussing the strength of its subprime business, it was well aware of the growing warning signs that the Company's mortgage business was in serious trouble. For example, on July 22, 2008 *Bloomberg News* reported:

> Toward the end of 2006, people familiar with Lehman's risk management operations say, executives at the firm started seeing trouble in the mortgage market. The securitization division raised rates on its bonds to reflect higher risk, which meant higher interest on loans Lehman's mortgage units made to home owners. When that didn't slow borrowing, lending standards were tightened, a

decision that was met with resistance by BNC and Aurora executives whose fees depended on volume, the people say.

Yalman Onaran, Lehman Fault-Finding, *Bloomberg News,* July 22, 2008.

103. Put another way, as far back as 2006, executives at Lehman Brothers were sending the Company internal signals regarding debt exposure problems stemming from its mortgage portfolio. Yet, despite these warning signs, Defendants took no measures to properly advise Plan Participants of the looming danger associated with their investment in Lehman Brothers Stock, thereby breaching their fiduciary duties to the Plan participants.

104. Lehman Brothers breaches of fiduciary duty continued throughout late 2006. Specifically, on December 14, 2006, Defendants issued a press release titled "Lehman Reports Record Net Revenues, Net Income and Earnings Per Share for Fiscal 2006; Reports Record Quarterly Net Revenues for the Fourth Quarter of 2006." The release stated, in relevant part:

> Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported net income of $1.0 billion, or $1.72 per common share (diluted), for the fourth quarter ended November 30, 2006, representing increases of 22% and 25%, respectively, from net income of $823 million, or $1.38 per common share (diluted), reported for the fourth quarter of fiscal 2005. Third quarter fiscal 2006 net income was $916 million, or $1.57 per common share (diluted).
>
> * * *
>
> Capital Markets net revenues increased 28% to $3.0 billion in the fourth quarter of fiscal 2006 from $2.4 billion in the prior year's fourth quarter on strong performances from both Fixed Income and Equities Capital Markets. *Fixed Income Capital Markets reported its second highest revenue quarter, an increase of 31% from the fourth quarter of fiscal 2005, reflecting strong levels of client activity, as well as improved results in credit products.* (Emphasis Added).

Based on this news, Lehman Brothers' Chairman and Chief Executive Officer, Richard S. Fuld, Jr. ("Fuld") told Plan Participants:

> Once again, we have achieved outstanding results across all our business segments and geographic regions this year. Our record

> performance is the result of our client-focused strategy and our
> continued investment in strategic areas that enable us to deliver the
> best capabilities, intellectual capital and solutions to our clients.
> As always, our success is a tribute to how well our people continue
> to work together across the Firm to deliver superior value to our
> clients and shareholders.

105.    Unbeknownst to Plan participants, however, in the face of this glowing report

Lehman Brothers implemented tactics specifically designed to offset its exposure to bad

subprime debt that it knew, or should have knows, was on the horizon. Specifically, in late 2006,

on information and belief, Lehman Brothers implemented a strategy to allow certain traders to

short impending mortgage losses. As *Bloomberg News* reported, "By the end of 2006, Lehman

started hedging against its mortgage exposure. Some traders were allowed to bet against the

prices of home loans by shorting indexes tied to mortgage securities." Lehman Fault-Finding,

*Bloomberg News*, July 22, 2008.

106.    Thus, by the end of 2006, Lehman Brothers had clear warning signs that an

inevitable subprime collapse loomed on the horizon. Armed with this knowledge, Defendants

did not take adequate actions to protect the Plan participants.

2.      *2007 – The Warning Signs of 2006 Become the Storm Clouds of 2007.*

107.    As the subprime market teetered on collapse, Lehman Brothers continued to tell

the market and Plan that the Company's financial health was robust. For example, on March 14,

2007, the Company issued a press release titled "Lehman Brothers Reports First Quarter Results;

Reports Record Net Revenues, Net Income, and Earnings Per Share." The release stated, in

relevant part:

> Lehman Brothers Holdings Inc. (ticker symbol: LEH) today
> reported record net income of $1.15 billion, or $1.96 per common
> share (diluted), for the first quarter ended February 28, 2007,
> representing increases of 6% and 7%, respectively, from net
> income of $1.09 billion, or $1.83 per common share (diluted),
> reported for the first quarter of fiscal 2006. Fourth quarter fiscal

> 2006 net income was $1.00 billion, or $1.72 per common share (diluted). The 2006 first quarter results include an after-tax gain of $47 million, or $0.08 per common share (diluted), from the cumulative effect of a change in accounting principle associated with the Firm's adoption of SFAS 123R on December 1, 2005.
>
> * * *
>
> Capital Markets reported record net revenues of $3.5 billion in the first quarter of fiscal 2007, an increase of 15% from $3.0 billion in the first quarter of fiscal 2006, *driven by strong performances in both Fixed Income and Equities Capital Markets. Fixed Income Capital Markets reported net revenues of $2.2 billion, its second highest revenue quarter and an increase of 3% from $2.1 billion in the first quarter of fiscal 2006,* reflecting record results in credit products as well as a strong performance in real estate, partially offset by declines in securitized products due to weakness in the U.S. residential mortgage sector and in interest rate products. [Emphasis added].

In response to this news Fuld publicly downplayed the "decline" in the U.S. mortgage market and continued to tout the Company's financial status, "[O]ur results clearly demonstrate that we are better positioned than ever to create value for our clients and our shareholders."

108. Behind the scenes, however, senior level executives at Lehman Brothers were becoming more vocal regarding mounting concerns with Lehman Brothers' mortgage portfolio. For example, on information and belief, Michael Gelband a senior executive in charge of fixed income (i.e. subprime debt) cautioned the Company from taking more risk in the subprime field. In response to this advice, the Company fired him. As *Bloomberg News* reported: "[a]t least two executive who urged caution were pushed aside . . . [M]ichael Gelband, 49, who ran fixed income . . . was pushed out altogether in May 2007 after he balked at taking more risk . . ." Lehman Fault-Finding, *Bloomberg News*, July 22, 2008.

109. Put another way, while Fuld publicly proclaimed that Lehman Brothers was "better positioned than ever," it was terminating senior executives who expressed concern

regarding its exposure associated with its subprime portfolio. Despite these clear warning signs,

Lehman Brothers negligently failed to take proper action to alter Plan investment strategies.

110.    On June 12, 2007, the Company issued a press release entitled "Lehman Brothers

Reports Record Quarterly Results; Reports 25% Increase in Net Revenues, 27% Increase in Net

Income and 31% Increase in Earnings Per Share from the Second Quarter of 2006." The

Company stated, in relevant part:

> Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported record net income of $1.3 billion, or $2.21 per common share (diluted), for the second quarter ended May 31, 2007, representing increases of 27% and 31%, respectively, from net income of $1.0 billion, or $1.69 per common share (diluted), reported for the second quarter of fiscal 2006. Net income and earnings per common share (diluted) for the second quarter of fiscal 2007 increased 11% and 13%, respectively, from net income of $1.1 billion, or $1.96 per common share (diluted), reported for the first quarter of fiscal 2007.
>
> * * *
>
> Capital Markets reported record net revenues of $3.6 billion in the second quarter of fiscal 2007, an increase of 17% from $3.1 billion in the second quarter of fiscal 2006, driven by a record performance in Equities Capital Markets. *Fixed Income Capital Markets reported net revenues of $1.9 billion, a decrease of 14% from $2.2 billion in the second quarter of fiscal 2006, as strong client demand across most products and increased real estate and credit product revenues were more than offset by continued weakness in the U.S. residential mortgage business and decreased revenues in the Firm's municipal and interest rate products businesses.* [Emphasis added].

Commenting on this news Fuld said, in relevant part, "For the first six months of fiscal 2007, the

Firm reported *record net revenues* of $10.6 billion, an increase of 19% from $8.9 billion for the

first half of fiscal 2006." [Emphasis added].

111.    Thus, despite acknowledging "continued weakness in the U.S. residential

mortgage business" Defendants failed to take appropriate actions to protect the Plan's

participants or alert Plan Participants of the seriousness of the Company's exposure related to its subprime holdings.

112.    On July 10, 2007, Lehman Brothers' subprime portfolio began to unravel. Specifically, the Company filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q revealed that the Company had "unrealized" losses of $459 million in that quarter from mortgages and mortgage-backed assets in its inventory.

113.    That same day *Bloomberg News* published an article entitled "Lehman Brothers Leads Brokerage Stocks Lower After S&P Subprime Warning." The article, in relevant part, stated:

> Lehman Brothers Holdings Inc. led declines in shares of U.S. securities firms after Standard & Poor's said it may cut ratings on $12 billion of bonds backed by subprime mortgages, a move that could shave trading profits.
>
> * * *
>
> Some insurers and pension funds are required to sell bonds when they're downgraded, potentially depressing prices of $800 billion in subprime mortgage bonds and $1 trillion of collateralized debt obligations, which repackage mortgage bonds into new securities. Lehman and other Wall Street firms have seen their revenue from fixed-income trading and sales drop in the second quarter, mostly due to weakness in mortgages.
>
> "Downgrades further hurt the mortgage bond business of the securities firms," said David Hendler, an analyst at CreditSights Inc. "Although they've fallen a lot already and the rating agencies usually are behind the curve, their downgrades bring down prices more."
>
> S&P said today that it's preparing to lower the ratings on 2.1 percent of the $565.3 billion of subprime bonds issued in late 2005 through 2006 because of a worse-than-anticipated U.S. housing slump. The company said it's also reviewing the ``global universe'' of collateralized debt obligations, or CDOs, that contain subprime mortgages, which are loans to the least creditworthy borrowers.

114.    In response to this news, as opposed to clearly and unambiguously informing the

Plan participants of the level of its exposure to shaky subprime investments, Lehman Brothers

took the exact opposite approach; namely, it obfuscated the totality of its exposure. Specifically,

on July 18, 2007, *Bloomberg* published an article entitled "Lehman Brothers Says Subprime

Speculation 'Unfounded.'" The article, in relevant part, stated:

> *Lehman Brothers Holdings Inc., the largest underwriter of U.S.*
> *mortgage bonds, denied speculation that it may face greater*
> *potential losses from subprime mortgages than previously*
> *disclosed.*
>
> Speculation about a planned announcement from Lehman Brothers
> related to its subprime holdings spurred investors to demand higher
> premiums to insure against the risk of owning Wall Street firms'
> bonds and helped prompt gains in Treasuries, according to traders
> including Thomas Tucci, head of U.S. government bond trading at
> RBC Capital Markets in New York.
>
> *"The rumors related to subprime exposure are unfounded,"*
> *Lehman spokeswoman Kerrie Cohen said today.*    [Emphasis
> added].

115.    In other words, at the very time Defendants should have been informing the Plan

participants of the scope of its subprime investments, the Company took the exact opposite

approach describing the looming crisis as "unfounded."    At best Defendants' tactics were a

breach of fiduciary duty under ERISA.

116.    On July 31, 2007, *Bloomberg* published an article entitled "Bear, Lehman

Brothers, Merrill, Goldman Traded as Junk, Derivatives Show." The article, in relevant part,

stated:

> On Wall Street, Bear Stearns Cos., Lehman Brothers Holdings
> Inc., Merrill Lynch & Co. and Goldman Sachs Group Inc., are as
> good as junk.
>
> *Bonds of U.S. investment banks lost about $1.5 billion of their face*
> *value this month as the risk of owning the securities increased* the
> most since at least October 2004, according to Merrill indexes.
> *Prices of credit-default swaps based on the debt imply that their*

*credit ratings are below investment grade, data compiled by Moody's Investors Service show.*

*The highest level of defaults in 10 years on subprime mortgages and a $33 billion pileup of unsold bonds and loans for funding acquisitions are driving investors away from debt of the New York-based securities firms.* Concerns about credit quality may get worse because banks promised to provide $300 billion in debt for leveraged buyouts announced this year.

\* \* \*

*Prices of credit-default swaps for Goldman, the biggest investment bank by market value, Merrill, the third largest, and Lehman Brothers, the No. 1 mortgage bond underwriter, also equate to a Ba1 rating, data from Moody's credit strategy group show. Bonds of New York-based Goldman and Merrill are rated Aa3, seven levels higher than swaps suggest. Lehman Brothers is rated A1, the same as Bear Stearns.* [Emphasis added].

117.    On information and belief, ignoring its fiduciary obligations, Lehman Brothers played the equivalent of a shell game in an effort to further obfuscate the extent of its total risk. For example, On August 2, 2007, *The Wall Street Journal* published an article entitled "Subprime Detectives Search in Dark for Next Victim – Wall Street Can Bury Mistakes in Fine Print." The article, in relevant part, stated:

The mystery of "where are the losses?" has confounded hedge funds searching for opportunities to bet against banks whose day of reckoning has yet to come.

*"We've been looking for financials that show losses from these securities on their books, and they've been very difficult to find,"* says Keith Long, president of Otter Creek Management, a hedge fund in Palm Beach, Fla., with $150 million in assets. "It's very opaque."

Investors have long complained about the lack of transparency when it comes to huge financial firms, *whose balance sheets are so big that they can easily mask multimillion-dollar gains or losses.* Analysts and investors currently cite several potential factors that could help hide subprime wounds.. [Emphasis added].

On information and belief, Lehman Brothers was engaged in similar efforts to "mask" the extent of its subprime exposure. For example, *Bloomberg News* later reported that, "Lehman's hedges

helped offset losses in the second half of 2007 and the first quarter of 2008. While the firm wrote down the value of mortgage-related assets *by more than $10 billion,* the net reduction to profit was only $3.3 billion." Lehman Fault Finding, *Bloomberg News*, July 22, 2008. In short, Defendants used a "gain" from one area to offset the totality of a "loss" in another, all the while continuing to assure the Plan's participants that Lehman Brothers Stock was a prudent investment.

118.    On August 10, 2007, Business Week published an article entitled "Subprime Woes Wallop Wall Street Firms." The article, in relevant part, stated:

> As more news about the looming credit crunch slapped major stock indexes lower on Thursday, the U.S.'s big investment banks got hit even harder. . . . *(LEH) dropped more than 7%.* Market anxiety had already caused financial stocks to drop more than 5% in the last month.
>
> * * *
>
> *One problem for big investment banks and hedge funds is they reveal very little to the public or investors about their internal holdings. "We don't know how many hidden skeletons there are in anybody's closet,"* Larkin says. [Emphasis added].

119.    On September 18, 2007, the Company issued a press release entitled "Lehman Brothers Reports Third Quarter Results; Reports Net Income of $887 Million and Net Revenues of $4.3 Billion." The press release, in relevant part, stated:

> Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported net income of $887 million, or $1.54 per common share (diluted), for the third quarter ended August 31, 2007, representing decreases of 3% and 2%, respectively, from net income of $916 million, or $1.57 per common share (diluted), reported for the third quarter of fiscal 2006. Net income and earnings per common share (diluted) for the second quarter of fiscal 2007 were $1.3 billion and $2.21, respectively.
>
> ***
>
> Capital Markets reported net revenues of $2.4 billion for the third quarter of fiscal 2007, a decrease of 14% from $2.8 billion in the third quarter of fiscal 2006. *Fixed Income Capital Markets*

> *reported net revenues of $1.1 billion, a decrease of 47% from $2.0*
> *billion in the third quarter of fiscal 2006, primarily due to lower*
> *performances within Credit and Securitized Products.   Within*
> *Fixed Income Capital Markets, the Firm recorded very substantial*
> *valuation reductions, most significantly on leveraged loan*
> *commitments and residential mortgage-related positions.   These*
> *losses were partially offset by large valuation gains on economic*
> *hedges and other liabilities.* The result of these valuation items
> was a net reduction in revenues of approximately $700 million.
> [Emphasis added].

120.    During this same time period, unbeknownst to the Plan's participants, Lehman

Brothers' executives were cautioning against continued hedging against the Company's

mortgage positions.   Specifically, Madelyn Antoncic, the former head of risk at Lehman

Brothers, "[w]as moved to a government relations job in September 2007" after warning

Company officials "[t]hat hedging mortgage positions had curtailed Lehman's profit . . ."

Lehman Fault Finding, *Bloomberg News*, July 22, 2008. In short, Lehman Brothers squeezed out

or reassigned critics of the Company's tactics related to its subprime investments. Worse, during

the entire time period, Defendants failed to take appropriate actions to protect the Plan

participants, and instead continued to tout the purchase of Company stock as a prudent

investment.

121.    On December 13, 2007, the Company issued a press release entitled "Lehman

Brothers Reports Record Net Revenues, Net Income and Earnings Per Share for Fiscal 2007;

Reports Net Income of $886 Million and Net Revenues of $4.4 Billion for the Fourth Quarter of

Fiscal 2007." The press release, in relevant part, stated:

> Lehman Brothers Holdings Inc. (NYSE: LEH) today reported net
> income of $886 million, or $1.54 per common share (diluted), for
> the fourth quarter ended November 30, 2007, representing
> decreases of 12% and 10%, respectively, from net income of $1.0
> billion, or $1.72 per common share (diluted), reported for the
> fourth quarter of fiscal 2006. For the third quarter of fiscal 2007,
> net income was $887 million, or $1.54 per common share
> (diluted).

. * * *

> Net revenues (total revenues less interest expense) for the fourth
> quarter of fiscal 2007 were $4.4 billion, a decrease of 3% from
> $4.5 billion reported in the fourth quarter of fiscal 2006 and an
> increase of 2% from $4.3 billion reported in the third quarter of
> fiscal 2007. Capital Markets net revenues decreased 10% to $2.7
> billion in the fourth quarter of fiscal 2007 from $3.0 billion in the
> fourth quarter of fiscal 2006. Fixed Income Capital Markets
> reported net revenues of $860 million, a decrease of 60% from
> $2.1 billion in the fourth quarter of fiscal 2006, due to the very
> challenging markets experienced during the period, although
> strong results from client activity were reported in the Foreign
> Exchange and Commodities businesses. Fixed Income Capital
> Markets recorded negative valuation adjustments on trading assets,
> principally in the Firm's Securitized Products and Real Estate
> businesses. These valuation adjustments were offset, in part, by
> valuation gains on economic hedges and liabilities, as well as
> realized gains from the sale of certain leveraged loan positions,
> resulting in a net revenue reduction in Fixed Income Capital
> Markets of approximately $830 million. .

122.    Thus, in the wake of an uproar of concerns regarding the collapse of the subprime

markets, Lehman Brothers continued to assure the market and Plan participants of the continued

viability of Lehman Brothers Stock and of the fact that the Company would remain virtually

unscathed by the subprime crisis, despite the Plan's material investment in Lehman Brothers

Stock.

**D.    Lehman Brothers' Failure to Disclose the Full Extent of its Losses Caused Investors to Lose Confidence in the Value of its Stock**

123.    Throughout the Class Period, Lehman Brothers was aware of the risk associated

with its subprime and mortgage investment portfolio. Despite that risk, Lehman Brothers failed

to adequately inform the Plan participants (or for that matter the market) that the Company's

subprime investments were in grave danger. Ultimately, Lehman Brothers' belated and partial

disclosures rocked investor confidence. By the end of the Class Period, Lehman Brothers Stock

was trading at an all-time low, at approximately $18 per share, down from a high of over $70 per

share at the beginning of the Class Period. Defendants breached their fiduciary obligations they

owed to the Plan and Plan participants by failing (or refusing) to inform Plan participants of the

full scope of the volatility of its subprime investments; knowledge Defendants possessed or

should have possessed, as far back as 2006.

124.    On a March 13, 2008 First Quarter Earnings Conference Call with analysts, CFO

Erin Callahan informed investors of the following related to the Company's Level 3 Assets

(Level 3 Assets are assets that have no reliable market price):

> In terms of level 3 assets, we expect a slight increase for the
> quarter to 39 billion. This represents 5% of total assets. So that's
> a rather detailed summary of our exposure. I wanted to give you
> that color, and wanted to give you some sense of why current
> dislocations in the market did significantly impact us, as we play in
> all of these asset classes. So our mark-to-market volatility is
> significant, we believe a significant portion of this is related to the
> liquidity.

Yet, even after acknowledging this problem, Defendants, as Plan fiduciaries, failed to properly

take actions to protect the Plan and Plan participants.

125.    Instead, on information and belief, in an effort to buoy investor confidence,

Lehman Brothers engaged in strategy to artificially lower its Level 3 assets by diverting them to

hedge fund investments. Specifically, on the Company's First Quarter Form 10-Q filed with the

SEC on May 13, 2008, Lehman Brothers listed Level 3 assets at $37.911 billion-- $1.1 billion

less than asserted in the Earnings Call.

126.    On information and belief, the missing $1.1 billion was diverted to a new hedge

fund in which Lehman Brothers owned a minority interest. Specifically, on July 3, 2008

*Bloomberg News* reported on the Company's investment in R3 Capital Partners stating:

> You don't need to know much more about Lehman's transactions
> with the fund, R3 Capital Partners, to see the problem.
>
> There's no way for outsiders to ascertain whether Lehman's
> dealings with R3 were at arm's length, as Lehman and R3 say they
> were. And the last thing Lehman needs is for skeptical investors to

> be worrying about whether it is engaging in any opaque related-party transactions.
>
> Lehman isn't providing much information about its dealings with R3, and hasn't mentioned the fund in its Securities and Exchange Commission filings.
>
> ***
>
> As of June 12, one fund managed by R3 had raised $1.08 billion [the precise amount of the Company missing Level 3 assets] from a single unidentified investor and was seeking to raise $4 billion more from others, according to a Form D disclosure that R3 filed with the SEC.
>
> Lehman has invested about $1 billion in R3, said Thor Valdmanis, a spokesman at R3's public relations firm, FD. (After he told me this, Valdmanis asked me not to use the information, saying he wasn't authorized to divulge it.)

Jonathan Weil, Lehman's Hedge-Fund Deals Leave Public in Dark, Bloomberg.com, July 3, 2008.

127.    Throughout the Class Period Defendants continued to peddle Lehman Brothers Stock as a strong investment for the Plan irrespective of the reality of the situation. This sentiment was reflected by the Company's CFO in its Fourth Quarter Earnings call for 2007 when she stated:

> In general, as we have indicated, we have come through the current downturn very well positioned on a competitive basis. We believe we can capitalize on this opportunity for 2008.

Lehman Brothers' Earnings Call Q4 2007 at pg 8. Throughout the "downturn," the Company's stock fell from a high of over $70.00 per share to its current value of approximately $18.00 per share.

## IX.    CONDUCT CONSTITUTING DEFENDANTS' FIDUCIARY BREACHES

128.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. The Defendants breached their duties to prudently and loyally manage the Plan's assets because, during the Class Period, Defendants knew or should

- 38 -

have known that Lehman Brothers Stock was not a prudent investment for the Plan and knew or should have known that the value of Lehman Brothers Stock was exposed to an unacceptable risk of loss.

129. Defendants' knowledge that the Lehman Brothers Stock was an imprudent investment is based on the fact that Defendants knew or should have known of the unsound business practices and risky lending activities and other misrepresentations alleged herein. Defendants failed to take adequate steps to prevent the Plan, and indirectly the participants, from suffering losses as a result of the Plan's investments in Lehman Brothers Stock.

130. Upon information and belief, not one of the Defendants conducted an appropriate investigation into whether Lehman Brothers Stock was a prudent investment for the Plan in light of the Company's unsound business practices, risky lending activities and other related serious corporate misconduct, and given the fact that the Plan held enormous investments in Lehman Brothers Stock. Moreover, not one of the Defendants provided the Plan's participants with information regarding the true nature of these business practices and the extraordinary risks that they presented to Lehman Brothers, such that the Plan's participants could make informed decisions regarding the Lehman Brothers Stock in the Plan. Indeed, not one of the Defendants took any meaningful action to protect the Plan against the risk of enormous losses as a result of the Company's very risky and inappropriate corporate misconduct.

131. On a Class-wide and Plan-wide basis the risk of an undiversified investment in Lehman Brothers Stock imposes a greater risk than that of other undiversified investments.

132. The risk associated with the investment in Lehman Brothers Stock during this time of unsound business practices was an extraordinary risk, far above and beyond the normal, acceptable risk associated with investment in company stock. This abnormal investment risk

could not have been known by the Plan's participants, and the Defendants knew or should have known that it was not known by them because the Defendant fiduciaries never disclosed it. This extraordinary risk made any investment in Company stock inappropriate and imprudent.

133.    Participants, even before placing any retirement savings in Lehman Brothers Stock, relied on the stability and financial viability of Lehman Brothers as the basis for their standard of living.   The participants' salaries, healthcare and other benefits, as well as the participants' pension (if any) and retirement health insurance depended upon Lehman Brothers continued solvency and viability.

134.    Thus, one of the risks that could impair the participant's investment in Lehman Brothers Stock – the failure or insolvency of the employer – would also cause the loss of current income and benefits and future non-Plan related retirement benefits.   The risks are correlated and, if realized, would financially devastate most employees and participants in the Plan. Therefore, the Defendants had a heightened duty with regard to both the decision to continue investing in Lehman Brothers Stock as well as the duty to inform participants concerning the imprudence of investing in Lehman Brothers Stock.

135.    Defendants breached their fiduciary duties when they failed to conduct an appropriate investigation into whether Lehman Brothers Stock was a prudent investment for the Plan; failed to develop appropriate investment guidelines for Lehman Brothers Stock; failed to divest the Plan of Lehman Brothers Stock; failed to discontinue further contributions of Lehman Brothers Stock to the Plan; failed to remove Lehman Brothers Stock as an investment option for the Plan; failed to either consult or appoint independent fiduciaries regarding the appropriateness of an investment in Lehman Brothers Stock; and failed to resign as fiduciaries of the Plan, if as a result of their employment by Lehman Brothers, they could not loyally serve the Plan and their

- 40 -

participants. In addition, these Defendants breached their fiduciary duties when they failed to prohibit any participant from making an "investment switch" into Lehman Brothers Stock. In fact, the Defendants continued to invest and to allow investment of the Plan's assets in Lehman Brothers Stock even though they knew or should have known that Lehman Brothers would be taking billions of dollars in losses to earnings to remedy its risky investment practices, resulting in a decrease in the value of Lehman Brothers Stock. No other Defendant fiduciary took any action to remedy the breaches set forth in this paragraph.

136.    The Defendants breached their fiduciary duties by direct and indirect communications with the Plan's participants, made in their fiduciary capacity, which contained statements concerning Lehman Brothers Stock that these Defendants knew or should have known were untrue and inaccurate. These communications included Class-wide and Plan-wide affirmative and materially misleading statements as to Lehman Brothers lending practices, Lehman Brothers earnings, and Lehman Brothers' profitability as detailed in this Complaint, that were contained in the following documents that, upon information and belief, were specifically incorporated into the SPD: SEC S-8 statements, SEC Form 10-K annual reports and interim periodic reports, Lehman Brothers' Annual Report, and the Plan's annual reports on SEC Form 11-K. In addition, the foregoing documents omitted, and continue to omit, material information concerning Lehman Brothers' financial performance, including Lehman Brothers' exposure to subprime mortgage-based securities. No Defendant took any action to remedy the breaches set forth in this paragraph.

137.    Moreover, Defendants knew or recklessly disregarded certain basic facts about the characteristics and behavior of the Plan participants, well-recognized in the 401(k) and ESOP industry and trade press:

(a)    Out of loyalty, employees tend to invest in company stock;

(b)    Employees tend not to change their investment option allocations in the plan once made;

(c)    Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(d)    Many employees do not recognize their exposure to massive loss from failing to diversify their investment.

138.    As a result of Defendants' knowledge of and implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any warnings of market and diversification risks that Defendants made to the Plan participants regarding the Plan's investment in Lehman Brothers Stock did not effectively inform the Plan participants of the past, immediate, and future dangers of investing in Lehman Brothers Stock.

139.    Based on their actual or constructive knowledge as set forth herein, Defendants knew about Lehman Brothers' risky exposure to the subprime credit market. Defendants knew or should have known of the affirmative misrepresentations made to Participants in the SEC documents and annual reports incorporated into the SPD. Defendants knew that the Plan participants lacked the knowledge that Defendants had or should have had concerning the unsound business practices and knew or should have known that the Plan participants would be harmed by this lack of knowledge. Defendants, on a Plan-wide and Class-wide basis, never accurately disclosed to Plaintiff or the Plan participants the true nature, extent, and risks of these problems. Rather, Defendants failed to timely communicate accurate information to the Plan participants concerning Lehman Brothers true financial condition, including its risky exposure to the subprime credit market in prior periods, when they knew or should have known that the Plan

participants needed this information. Defendants and/or their individual fiduciary delegates, on a Class-wide and Plan-wide basis, failed to provide the Plan participants with complete and accurate information regarding Lehman Brothers Stock, such that the participants could appreciate the true risks presented by investments in Lehman Brothers Stock and could make informed decisions, thereby avoiding the unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Lehman Brothers Stock. No Defendant took any action to remedy the breaches set forth in this paragraph.

140.    The Lehman Brothers Defendants and Board Defendants failed in their fiduciary responsibilities in monitoring the Committee Defendants. The Lehman Brothers Defendants and Board Defendants breached their fiduciary duties because they did not have procedures in place so that they could review and evaluate on an ongoing basis whether the Committee Defendants were performing their duties adequately and in accordance with ERISA's fiduciary provisions. The Lehman Brothers Defendants and Board Defendants breached their fiduciary duty to remove the Committee Defendants when they knew the Committee Defendants had breached their fiduciary duties. The Lehman Brothers Defendants and Board Defendants failed to adequately review the performance of the Committee Defendants to: ensure that they were fulfilling their fiduciary duties under the Plan and ERISA; ensure that they had adequate information to do their job of overseeing the Plan's investments; ensure that they had adequate access to and use of impartial advisors when needed; and ensure that they reported regularly to the Board.

## X.    CAUSATION

141.    The Plan suffered massive losses because a substantial amount of the Plan's assets were imprudently invested in Lehman Brothers Stock during the Class Period, and in breach of Defendants' fiduciary duties.

142.    Had Defendants properly discharged their fiduciary duties, including the provision of full and accurate disclosure of material facts concerning Lehman Brothers Stock and divesting the Plan from Lehman Brothers Stock offered by the Plan when such investment became imprudent, the Plan would have avoided losses suffered in Lehman Brothers Stock.

143.    As a result of Defendants' actions, Plaintiff and the Class, which invested in Lehman Brothers Stock through the Plan, were wrongfully damaged, as the Plan suffered substantial losses from Defendants' failure to fulfill their fiduciary responsibilities as described herein.  Had the fiduciaries acted prudently and in accordance with their fiduciary duties, they would have taken steps to eliminate or reduce the amount of Lehman Brothers Stock held by the Plan, eliminated the option for participants to place funds in Lehman Brothers Stock, or fully disclosed the material adverse facts concerning Lehman Brothers Stock described herein. Plaintiff and the Class are entitled to the best alternative investment available to them under the circumstances, and the Plan would have achieved gains and avoided losses but for Defendants' breach of fiduciary duty as described herein.

## SECTION 404(c) DEFENSE IS INAPPLICABLE

144.    The Plan and the Plan's fiduciaries do not qualify for any affirmative defense based on ERISA Section 404(c) as the Plan did not satisfy the numerous stringent requirements of Section 404(c) and the Department of Labor Regulations promulgated there under, as set forth in 29 C.F.R. § 2550.404c-1.  This is because Defendants, among other ERISA § 404(c) disclosure failures, failed to ensure effective participant control by providing complete and accurate material information to participants regarding Lehman Brothers Stock. *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions"). As a consequence, participants in the Plan did not have informed control over the portion of the Plan's assets that were invested in Lehman Brothers Stock as a result of

- 44 -

their investment directions, and the Defendants remained entirely responsible for losses that result from such investment.

145.    Furthermore, under ERISA, fiduciaries - not participants - exercise control over the selection of investment options made available to participants. Thus, whether or not participants are provided with the ability to select among different investment options, and whether or not participants exercised effective control over their investment decisions (which was not the case here), liability attaches to the fiduciaries if an imprudent investment option is selected by the fiduciaries and presented as an option to participants, and as a result of such action the Plan suffer a loss. Because this is precisely what occurred in this case, Defendants are liable for the losses incurred by the Plan and are not entitled to any protection under ERISA § 404(c).

146.    The losses suffered by the Plan and the Plan participants and beneficiaries, including Plaintiff and the Class, were the direct and necessary result of the misconduct of Defendants alleged herein. Plaintiff and the Class were unaware, and in the exercise of reasonable diligence could not have been aware, of the true and accurate extent of Lehman Brothers risky and unsound business practices, as well as Defendants' continuing breaches of fiduciary duty in failing to disclose such material facts.

## XI.    REMEDIES FOR DEFENDANTS' BREACH OF THEIR FIDUCIARY DUTIES

147.    Defendants breached their fiduciary duties in that they knew or recklessly disregarded the facts as alleged above, and therefore knew or recklessly disregarded that the Plan's assets should not have been so heavily invested in Lehman Brothers Stock. As a consequence of the Defendants' breaches, the Plan suffered significant losses.

148.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires

"any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

149.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

150.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan in the amount of the losses to the Plan resulting from the breaches of fiduciary duties alleged above and to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA § 409(a) and 502(a)(2)-(3), 29 U.S.C. § 1109(a) and § 1132(a)(2)-(3); (3) reasonable attorneys' fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

## COUNT I
### Failure to Prudently Manage the Plan's Assets;
### Breach of Fiduciary Duties in Violation of ERISA § 404
### (Against All Defendants )

151.    Plaintiff incorporates the foregoing paragraphs herein by reference.

152.    The Plan are governed by the provisions of ERISA, 29 U.S.C. § 1001, *et. seq.*, and Plaintiff and the Class are participants and/or beneficiaries in the Plan.  Defendants are all fiduciaries with respect to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).    They were thereby bound by the duties of loyalty, exclusive purpose, and prudence.

153.    Defendants named in this Count were each responsible, in different ways and degrees, for the Plan's investments in Lehman Brothers Stock.

154.    Under ERISA, fiduciaries who exercise discretionary authority or control over the management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to plan participants are prudent.    Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.

155.    The fiduciary duty of loyalty likewise entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

156.    Defendants named in this Count were responsible for ensuring that investment in Lehman Brothers Stock was prudent and consistent with the purpose of the Plan.  Defendants are liable for any and all losses incurred as a result of such investments being imprudent.

157.    During the Class Period, the Defendants named in this Count knew or should have known that Lehman Brothers Stock was not a suitable, prudent or appropriate investment for the Plan as described herein, irrespective of any duty of diversification that may exist. Notwithstanding this knowledge, these Defendants offered and continued to offer Lehman

- 47 -

Brothers Stock as investment options for the Plan and/or offered and continued to offer to direct and approve the investment in Lehman Brothers Stock.

158.    Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, the Defendants named in this Count failed to take any meaningful steps to prevent the Plan, and indirectly the Plan's participants and beneficiaries, from suffering losses as a result of the Plan's investments in Lehman Brothers Stock. The Defendants named in this Count knew or should have known that a prudent fiduciary acting under similar circumstances would have made different investment decisions with respect to the Lehman Brothers Stock and that continued investment in Lehman Brothers Stock was not in keeping with the Plan's settlors' expectation on how a prudent fiduciary would operate.

159.    The Defendants named in this Count had actual or constructive knowledge of the Company's serious mismanagement, risky exposure to the subprime credit market and other misrepresentations that impacted Lehman Brothers Stock as alleged in this Complaint. Despite this knowledge, they participated in each other's failures to prudently manage the Plan's assets and knowingly concealed such failures by not informing the Plan participants that Lehman Brothers Stock was not a prudent investment.

160.    In addition to other breaches of fiduciary duty alleged in this Count, the Defendants committed the following fiduciary breaches: (a) failed to conduct an appropriate investigation into whether Lehman Brothers Stock was a prudent investment for the Plan; (b) failed to develop appropriate investment guidelines for Lehman Brothers Stock; (c) failed to divest the Plan of Lehman Brothers Stock; (d) failed to discontinue further Plan contributions to Lehman Brothers Stock; (e) failed to remove Lehman Brothers Stock as investment options of the Plan; (f) failed to either consult or appoint independent fiduciaries regarding the

appropriateness of an investment in Lehman Brothers Stock; (g) failed to notify appropriate federal agencies, including the Department of Labor, of the facts and circumstances that made Lehman Brothers Stock an unsuitable and imprudent investment for the Plan; and (h) failed to resign as fiduciaries of the Plan if, as a result of their employment by Lehman Brothers or its affiliates, they could not loyally serve the Plan and their participants. In addition, these Defendants breached their fiduciary duty when they failed to prohibit any participant in the Plan from making an "investment switch" into Lehman Brothers Stock.

161. As a result of the breach of fiduciary duties of the Defendants named in this Count, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

162. Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA §409, 29 U.S.C. § 1109(a), Defendants named in this Count are personally liable to restore the losses to the Plan caused by their breach of fiduciary duty as alleged in this Count.

## COUNT II
### Failure to Provide Complete and Accurate Information to Participants and Beneficiaries; Breaches of Fiduciary Duties in Violation of ERISA § 404 (Against All Defendants)

163. Plaintiff incorporates the foregoing paragraphs herein by reference.

164. At all relevant times herein, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

165. During the Class Period, Defendants knew or should have known that Lehman Brothers Stock was not a suitable, prudent or appropriate investment for the Plan.

166. As alleged herein, the scope of the Defendants' fiduciary duties and responsibilities included drafting and disseminating Plan documents, SPDs and information to participants regarding the assets of the Plan.

- 49 -

167.  All Defendants had a duty to provide participants with information they possessed that they knew or should have known would have a material impact on the Plan.

168.  The duty of loyalty under ERISA requires the Defendants to speak truthfully to the Plan participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. The Defendants' duty of loyalty included not only the negative duty not to misinform, but also an affirmative duty to inform when the Defendants' knew or should have known that silence might be harmful. If a fiduciary knows that a material misrepresentation has been made to a Participant, that fiduciary, without regard to the functions that make that person a fiduciary, has an affirmative duty to correct that misrepresentation. Moreover, Defendants are required to provide each participant with sufficient information to make informed decisions with regard to investment alternatives available under the Plan, including Lehman Brothers Stock.

169.  The fiduciary duty of loyalty likewise entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plan sponsor.

170.  This duty to inform participants included the Defendants' obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plan's investment options such that participants can make informed decisions with regard to investment options available under the Plan. This duty applies to all of the Plan's investment options, including the Lehman Brothers Stock.

171.    Because a substantial percentage of the Plan's assets were invested in Lehman Brothers Stock, such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to Lehman Brothers Stock.

172.    Because of the disparity in knowledge between Defendants and the Plan participants, the participants relied on Defendants to provide them with accurate and complete information about Lehman Brothers, which was material to the suitability of Lehman Brothers Stock as a prudent investment option.

173.    The fiduciary duty to honestly communicate with participants is designed not merely to inform participants and beneficiaries of conduct, including illegal conduct, bearing on their retirement savings, but also to forestall such illegal conduct in the first instance. By failing to discharge their disclosure duties, the Defendants facilitated the illegal conduct in the first instance.

174.    The Defendants breached their fiduciary duties by direct and indirect communications with the Plan participants, made in their fiduciary capacity, which contained statements concerning Lehman Brothers Stock that these Defendants knew or should have known were untrue and inaccurate. These communications included Class-wide and Plan-wide affirmative and materially misleading statements as to Lehman Brothers' unsound business practices and Lehman Brothers' risky exposure to the subprime credit market as detailed in this Complaint.

175.    The Defendants breached their fiduciary duties not only with regard to the affirmative misrepresentations, but also because those documents omitted, and continue to omit, material information concerning Lehman Brothers' serious mismanagement, including Lehman

- 51 -

Brothers' risky exposure to the subprime credit market. In addition, the Defendants breached their fiduciary duties by conveying inaccurate information regarding the soundness or security of Lehman Brothers Stock and the prudence of investing retirement contributions in Lehman Brothers Stock.

176.    All Defendants breached their fiduciary duty when they failed to provide Plan participants, on a Class-wide and Plan-wide basis, information regarding the imprudence of investing in Lehman Brothers Stock. All Defendants knew or should have known that the Plan participants lacked the knowledge that Defendants possessed concerning the imprudence of investing in Lehman Brothers Stock; knew or should have known that the Plan participants would be harmed by this lack of knowledge; and knew or should have known that material misrepresentations regarding Lehman Brothers Stock were made to the Plan participants. All Defendants, on a Plan-wide and Class-wide basis, never accurately disclosed to Plaintiff or the Plan's participants the true nature, extent, and risks of investing in Lehman Brothers Stock when they knew or should have know that investment in Lehman Brothers Stock was imprudent. Rather, all Defendants failed to timely communicate accurate information to the Plan participants concerning Lehman Brothers' risky exposure to the subprime credit market during the Class Period when they knew or should have known that the Plan participants needed this information.

177.    As a consequence of Defendants' breaches of fiduciary duty alleged in this Count, the Plan suffered tremendous losses. If the Defendants had discharged their disclosure obligations prudently and in the sole interests of the Plan participants and beneficiaries, then losses suffered by the Plan would have been avoided or greatly minimized. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly

Plaintiff and the other Class members, lost hundreds of millions, if not billions of dollars of retirement savings.

178.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA §409, 29 U.S.C. § 1109(a), the Defendants are personally liable to the Plan for these losses incurred as a result of Defendants' misrepresentations to the Plan participants as well as their breach of the fiduciary duty to disclose and inform.

## COUNT III
### Failure in Appointing and Monitoring Plan Fiduciaries; Breaches of Fiduciary Duties in Violation of ERISA § 404 (Against the Board Defendants)

179.    Plaintiff incorporates the foregoing paragraphs herein by reference.

180.    At all relevant times herein, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

181.    At all relevant times herein, the fiduciary duties of the Board Defendants included the power and responsibility to appoint, and the duty to oversee and thereby monitor the performance of the Committees.

182.    At all relevant times herein, the scope of the fiduciary duties of the Board Defendants included the oversight and the power and responsibility to appoint, and thereby monitor the performance of the Committees.

183.    During the Class Period, Defendants knew or should have known that Lehman Brothers Stock was not a suitable, prudent or appropriate investment for the Plan, as described herein.

184.    Under ERISA, a fiduciary with appointment powers must ensure that the appointed fiduciaries are performing their fiduciary obligations, including those obligations with respect to handling, holding and investing plan assets; and must take prompt and effective action

to protect the Plan and participants when the appointed fiduciaries are not meeting their fiduciary obligations.

185.    The appointing fiduciary must have procedures in place so that they may review and evaluate on an ongoing basis whether the appointed fiduciaries are doing an adequate job (including, for example, by requiring periodic reports on their work and the Plan's performance, and by ensuring that they have a prudent process for obtaining information and resources they need).    In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for (1) promptly and prudently concluding that their appointees were faithfully and effectively performing their obligations to the Plan participants; or (2) deciding whether to retain or remove their appointees.

186.    An appointing fiduciary must provide the appointed fiduciaries with all the information that they have or reasonably should have in order to prudently manage the Plan and the Plan's assets or that may have a material impact on the Plan and the fiduciaries' investment decisions regarding the Plan.

187.    The Board Defendants breached their fiduciary appointing and monitoring duties by, among other things: (1) failing to appoint persons with the requisite knowledge, skill, and expertise to properly administer the Plan and manage their assets; (2) failing to adequately monitor their appointees, evaluate their performance, or have an adequate system in place for doing so, (and standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent action); (4) failing to ensure that the appointed fiduciaries (although possessing actual knowledge of   unsound business practices and risky lending activities and other misrepresentations concerning Lehman Brothers Stock as alleged herein) understood the true extent of Lehman Brothers' risky exposure to the subprime credit market and its impact on the

value of Lehman Brothers Stock and the Plan's concomitant investment in Lehman Brothers Stock.

188.    The Board Defendants breached their fiduciary duty by failing to remove the appointed fiduciaries, as named herein, whose performance was inadequate.    The Board Defendants, knew that the appointed fiduciaries: (a) failed to conduct an appropriate investigation into whether Lehman Brothers Stock was a prudent investment for the Plan; (b) failed to develop appropriate investment guidelines for Lehman Brothers Stock; (c) failed to divest the Plan of Lehman Brothers Stock; (d) failed to discontinue further Plan contributions to Lehman Brothers Stock; (e) failed to remove Lehman Brothers Stock as investment options for the Plan; (f) failed to consult with or appoint independent fiduciaries regarding the appropriateness of an investment in Lehman Brothers Stock; (g) failed to prohibit any participant from making an "investment switch" into Lehman Brothers Stock; (h) failed to notify appropriate federal agencies, including the Department of Labor, of the facts and circumstances that made Lehman Brothers Stock an unsuitable or imprudent investment for the Plan; and (i) failed to inform the Plan participants that investment in Lehman Brothers Stock would not be prudent.

189.    As a consequence of the Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  Had Defendants named in this Count discharged their fiduciary duties as described above, the losses suffered by the Plan would have been averted or, at a minimum, lessened.    Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the other Class members, lost hundreds of millions, if not billions of dollars of retirement savings.

190.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

191.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA §409, 29 U.S.C. § 1109(a), the Board Defendants are personally liable to restore the losses to the Plan caused by their failure to monitor and remove fiduciaries as alleged in this Count.

## COUNT IV
### Co-Fiduciary Liability;
### Breaches of Fiduciary Duties in Violation of ERISA § 405
### (Against all Defendants)

192.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

193.    At all relevant times, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

194.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability that he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if: (i) he participates in, or undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (ii) he fails to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) in the administration of his specific responsibilities that give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (iii) he knew or should have known of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

195.    During the Class Period, Defendants knew that Lehman Brothers Stock was not a suitable, prudent or appropriate investment for the Plan as described herein.

**Failure to Remedy**

196.    ERISA § 405(a)(3), 29 U.S.C. § 1105(3) imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

197.    The Board Defendants were aware that the Committee Defendants breached their fiduciary duties as alleged in Count I of the Complaint.  Despite this knowledge, the Board Defendants failed to undertake any effort to remedy their co-fiduciaries' failures to prudently and loyally manage the Plan's investment in Lehman Brothers Stock, as well as other fiduciary breaches alleged in Count I.  Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3).  The actions that the Board Defendants could have taken, included but are not limited to: (1) objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board; (2) disclosing the imprudence of the investment in Lehman Brothers Stock to the Plan's participants; (3) notifying the U.S. Department of Labor of their co-fiduciaries actions; or (4) preparing to obtain an injunction from a Federal District Court.

198.    To the extent that it is determined that any Board Defendant and/or Committee Defendant did not breach his fiduciary duty as alleged in Count I of the Complaint, that Defendant was still aware that the remaining Defendants in Count I did, in fact, breach their fiduciary duties.  Despite this knowledge, the Defendant(s) named in this paragraph breached their fiduciary duties by failing to undertake any effort to remedy their co-fiduciaries' failures to prudently and loyally manage the Plan's investment in Lehman Brothers Stock and other fiduciary breaches alleged in Count I.  Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3). The actions that

the Defendant(s) could have taken included but are not limited to: objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board or Committee; disclosing the imprudence of the investment in Lehman Brothers Stock to Plan Participants; notifying the U.S. Department of Labor of their co-fiduciaries' conduct; or preparing to obtain an injunction from a Federal District Court.

199.    To the extent that it is determined that any Defendant did not commit any of the fiduciary breaches as alleged in Count II of the Complaint, any such Defendant was still aware that the remaining Defendants named in Count II breached their fiduciary duties. Despite this knowledge, the Defendant(s) named in this paragraph breached their fiduciary duty by failing to undertake any effort to remedy the fiduciary breaches alleged in Count II, including the duty to remedy their co-fiduciaries' misrepresentations and their co-fiduciaries' breach of the affirmative duty to inform the Plan participants regarding the imprudence of investing in Lehman Brothers Stock. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3). The actions that the Defendant(s) could have taken included but are not limited to: (1) objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board; (2) disclosing the imprudence of the investment in Lehman Brothers Stock to the Plan Participants; (3) notifying the U.S. Department of Labor of their co-fiduciaries' conduct; or (4) preparing to obtain an injunction from a Federal District Court.

**Enabling a Breach**

200.    ERISA § 405(a)(2), 29 U.S.C. § 1105(2) also imposes co-fiduciary liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(l), in the

- 58 -

administration of his specific responsibilities that give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

201.    To the extent that it is determined that any Board Defendant or Committee Defendant lacked knowledge of the circumstances rendering the Plan's investment in Lehman Brothers Stock imprudent, then all other Defendants enabled the imprudent asset management decisions of that Defendant by failing to provide that Defendant with complete and accurate information regarding the Company's risky exposure to the subprime credit market and other misrepresentations concerning Lehman Brothers Stock.  In failing to inform their co-fiduciaries, who lacked knowledge, if any, these Defendants breached ERISA § 405(a)(2).

202.    Through their failure to properly and effectively monitor their appointees, including the removal of those whose performance was inadequate as alleged in this Complaint, the Board Defendants enabled the Committee Defendants imprudent management of Lehman Brothers Stock in the Plan.

203.    Further, through their failure to properly and effectively monitor their appointees, including the removal of those whose performance was inadequate as alleged above, the Board Defendants and Committee Defendants enabled the remaining Defendants' imprudent management of Lehman Brothers Stock in the Plan.

204.    The Board Defendants' failure to monitor the Committee Defendants enabled the Committee Defendants to breach their duties.

205.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

206.   Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), ERISA § 409, 29 U.S.C. § 1109(a), and ERISA § 405, 29 U.S.C. § 1105, Defendants are liable to restore the losses to the Plan caused by their co-fiduciary breaches of fiduciary duties alleged in this Count.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.   Determining that this is a proper class action to be certified under Rule 23 and appointing Plaintiff class representative on behalf of the Class; Declaring that Defendants, and each of them, are not entitled to protection under ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

B.   Declaring that Defendants have violated the duties, responsibilities, and obligations imposed upon them as fiduciaries and co-fiduciaries and that they violated the ERISA disclosure and monitoring requirements as described above;

C.   Compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits that the participants would have made had Defendants fulfilled their fiduciary obligations;

D.   Awarding actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

E.   Enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.   Requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Lehman Brothers Stock;

G.   Awarding extraordinary, equitable, and/or injunctive relief as permitted by law, equity, and the federal statutory provisions set forth herein, pursuant to Fed. R. Civ. P. 64 and 65;

H.   Awarding the Plan and/or Plaintiff and members of the Class, restitution, disgorgement, and/or other remedial relief;

I.   Awarding the Plan and/or Plaintiff and members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees, and other costs; and

J.    Awarding such other relief as this Court may deem just and proper.

DATED:  July 25, 2008                          Respectfully submitted,

                                               MILBERG LLP

                                               By:

                                               Lori G. Feldman  LF 3478
                                               Arvind B. Khurana  AK 3643
                                               Sara Fuks  SF 6034
                                               Jennifer Sosa  JS 0324
                                               One Pennsylvania Plaza
                                               New York, NY  10119-0165
                                               Telephone: (212) 594-5300
                                               Facsimile:  (212) 868-1229
                                               lfeldman@milberg.com
                                               akhurana@milberg.com
                                               sfuks@milberg.com
                                               jsosa@milberg.com

                                               *Attorneys for Plaintiff*

**ZIMMERMAN REED**
Timothy J. Becker
Kirsten D. Hedgberg
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
(612) 341-0400 (telephone)
(612) 341-0844 (facsimile)
TJB@zimmreed.com
KDH@zimmreed.com

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Gregg M. Fishbein
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401-2197
(612) 339-6900 (telephone)
(612) 339-0981 (facsimile)
gmfishbein@locklaw.com

**HARWOOD FEFFER LLP**
Robert I. Harwood
488 Madison Avenue, 8th Floor
New York, New York 10022
(212) 935-7400 (telephone)
(212) 753-3630 (facsimile)
rharwood@hfesq.com

*Of Counsel*